IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIC BAUGHMAN,                    )
                                  )
          Plaintiff,              )
                                  )
     vs.                          ) Civil Action No. 05-1034
                                  )
COMMISSIONER OF SOCIAL            )
SECURITY,                         )
                                  )
          Defendant.              )

**MEMORANDUM OPINION**

**I. INTRODUCTION**

Plaintiff, Eric Baughman, seeks judicial review of a
decision of defendant, Commissioner of Social Security ("the
Commissioner"), denying his application for supplemental security
income ("SSI") under Title XVI of the Social Security Act, 42
U.S.C. §§ 1381-1383f.  Presently before the Court are the
parties' cross-motions for summary judgment pursuant to
Fed.R.Civ.P. 56.  For the reasons set forth below, the motions
will be denied and the matter remanded to the Commissioner for
further proceedings.

1

## II. Background

### A. Procedural History

Plaintiff filed an application for SSI on July 22, 2003,
alleging disability since July 2, 2003 due to kidney and liver
problems and Hepatitis C.[1]  (R. 78-80, 85).  After review,
plaintiff's application was denied by the Social Security
Administration on November 6, 2003 (R. 55-58), and plaintiff
requested a hearing before an Administrative Law Judge ("ALJ").
(R. 63).

On August 4, 2004, a hearing was held before ALJ Robert C.
Deitch.  Plaintiff, who was represented by counsel, and a
vocational expert ("VE") testified at the hearing.  (R. 21-52).
On April 14, 2005, the ALJ issued a decision denying plaintiff's
application for SSI.  Specifically, the ALJ concluded that,
despite severe impairments, plaintiff was able to perform a wide

---

[1]In order to establish a disability under the Social
Security Act, a claimant must demonstrate an inability to engage
in any substantial gainful activity due to a medically
determinable physical or mental impairment which can be expected
to last for a continuous period of not less than 12 months.  42
U.S.C. § 423(d)(1).  A claimant is considered unable to engage in
any substantial gainful activity only if his physical or mental
impairment or impairments are of such severity that he is not
only unable to do his previous work but cannot, considering his
age, education, and work experience, engage in any other kind of
substantial gainful work which exists in the national economy.
42 U.S.C. § 423(d)(2)(A).

2

range of work activity at the light exertional level.[2]  (R. 12-19).

Plaintiff requested review of the ALJ's decision (R. 8-9); however, the request was denied by the Appeals Council on May 20, 2005.  (R. 4-7).  This appeal followed.

## B. Facts

Plaintiff's testimony at the hearing before the ALJ on August 4, 2004 may be summarized as follows:

Plaintiff was born on October 9, 1957.  He was 47 years old on the date of the hearing.  With respect to education, plaintiff completed the 10th grade.  Subsequently, he attempted to obtain a General Equivalency Diploma (GED); however, he "couldn't get through the course."  (R. 26).  As to work history, plaintiff last engaged in substantial gainful activity in 2000 when he was employed as a truck driver for an asphalt company.  He held that employment for a year or two.  (R. 27-28, 32).

---

[2]As defined in the Social Security Regulations, "light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  20 C.F.R. § 404.1567(b)

In July, 2003, plaintiff was hospitalized for nine days as a result of multiple organ failure due to Hepatitis C.[3] Plaintiff suffers from diabetes for which he receives four injections of insulin a day. He also takes Glucophage and Actos on a daily basis for the diabetes. The diabetes causes constant neuropathy in plaintiff's legs and feet for which he takes Neurontin, the need to urinate frequently and blurred vision at various times throughout the day. In addition, plaintiff suffers from constant low back pain for which he takes Hydrocodone (Vicodin) on a daily basis.[4] The medications are prescribed by his primary care physician, Dr. Antoine Cawog, and they provide plaintiff with some relief from the pain.[5] (R. 29, 31-34, 36-38, 42). Since an episode of Bell's palsy in 1993, plaintiff also suffers from periodic migraine headaches. When he has a migraine headache, plaintiff is unable to "do much at all." (R. 34-35). As to side effects from his medications, plaintiff experiences fatigue which

---

[3]Plaintiff is followed by Dr. Lora for this condition. At the time of the hearing, plaintiff was not taking any medication for the Hepatitis C. (R. 35-36).

[4]Plaintiff testified that his low back pain began while he was employed as a truck driver and is caused by two pinched nerves. (R. 33).

[5]With respect to the relief that plaintiff obtains from the Vicodin prescribed by Dr. Cawog for his low back pain, plaintiff testified: "I still have it, but it's not near as bad. I mean I can do some things without being in real bad pain ...." (R. 34).

4

requires him to nap "a couple of times a day" for an hour or longer. (R. 37).

Plaintiff resides in an apartment with his mother who cooks, cleans and does the laundry and grocery shopping. Plaintiff's brother and sister-in-law maintain the yard. With regard to hobbies, plaintiff goes fishing occasionally; however, he has to take a special chair to sit in. (R. 30, 38-39). As to physical limitations due to his medical conditions, plaintiff is limited to sitting for 5 minutes at a time, standing for 10 to 15 minutes at a time, walking for 50 to 100 feet at a time, and lifting 10 pounds occasionally. (R. 40-42).

## C. Evidence in the Record

The administrative record in this case contains the following evidence:

**1. Records of Westmoreland Primary Health Center - 1/17/02 to 7/1/03**

On January 17, 2002, plaintiff was seen at the Westmoreland Primary Health Center ("WPHC") for a physical examination. The notes of this visit indicate that plaintiff had undergone a physical examination for the Department of Transportation ("DOT") on October 26, 2001, and that he had been given a 3-month card at that time due to uncontrolled diabetes mellitus.[6] Following the

---

[6]During the hearing before the ALJ, plaintiff testified that he was required to have a commercial driver's license while he

5

physical examination, plaintiff was given refills for his medications for diabetes and hypertension, as well as another 3-month card for the DOT.  (R. 147, 170).

On March 25, 2002, plaintiff was seen at the WPHC for a checkup in connection with his diabetes.  At the time, plaintiff complained of migraine headaches, and medication was prescribed for the headaches.  The notes of this visit indicate that plaintiff would be rechecked for the DOT in one month.  (R. 146).

On May 13, 2002, plaintiff returned to the WPHC for a blood pressure check.  He was prescribed medication and instructed to return on May 31, 2002 for another blood pressure check.  (R. 145).  During the followup visit on May 31st, plaintiff reported that the medication prescribed for his migraine headaches was not working.  The doctor prescribed another medication, and plaintiff was given a one-month card for the DOT.  (R. 144).

Plaintiff's next followup visit at the WPHC occurred on July 26, 2002.  Plaintiff's vital signs were taken and his medications were reviewed.  The notes of the visit indicate that plaintiff would be rechecked on August 1, 2002.  (R. 143, 168).  Plaintiff underwent another physical examination at the WPHC for the DOT on October 24, 2002.  (R. 142).

---

was employed as a truck driver.  (R. 32).  Presumably, plaintiff's physical examinations for the DOT were related to maintenance of that license.

6

The next notes of the WPHC are dated July 1, 2003 and indicate that plaintiff was seen for complaints of nausea, vomiting and dizziness. Plaintiff underwent x-rays and blood tests and was instructed to go to the emergency room. (R. 141, 161-67).

**2. Records of Westmoreland Regional Hospital - 7/2/03 to 7/10/03**

On July 2, 2003, plaintiff was seen in the Emergency Department of Westmoreland Regional Hospital for complaints of dizziness, weakness and nausea. He was admitted to the hospital with a diagnosis of acute renal insufficiency and hepatitis, and IV fluids and medications were initiated. While hospitalized, plaintiff had "sky high sugars." He was placed on an insulin drip, which brought his blood sugar levels "under better control." By July 10, 2003, plaintiff was vitally stable and afebrile, and he had been leaving the floor "very frequently to go get the paper, to smoke, etc." As a result, he was discharged from the hospital with instructions to followup on an outpatient basis. (R. 117-32).

**3. Records of Westmoreland Primary Health Center - 7/14/03 to 8/11/03**

During his followup visit at the WPHC on July 14, 2003, plaintiff reported feeling better. (R. 140). Blood tests on July 21, 2003 showed high blood sugar levels. (R. 156).

7

Plaintiff's next followup visit at the WPHC took place on July 22, 2003. (R. 139). Blood tests on August 1 and August 11, 2003 continued to show high blood sugar levels. (R. 148, 172).

### 4. Letter of Juan A. Lora, M.D. - 8/7/03

On August 7, 2003, Dr. Juan A. Lora of Westmoreland Gastroenterology Associates, P.C. saw plaintiff for a followup visit in connection with his July hospitalization for Hepatitis C. In a letter to Dr. Steven Mills, the physician who treated plaintiff at the WPHC, Dr. Lora noted that plaintiff denied any abdominal pain, nausea, vomiting, weight loss or weakness, although plaintiff continued to suffer from back pain for which he took Oxycodone. Dr. Lora indicated that the plan for plaintiff was to follow his liver function tests, and, if the results did not return to normal, to recommend a liver biopsy and consider treatment. Dr. Lora noted that it was possible for the infection to clear on its own. (R. 171).

### 5. Records of Antoine F. Cawog, M.D. - 8/03 to 7/04

In August, 2003, shortly after his hospitalization for Hepatitis C, plaintiff saw Dr. Antoine Cawog, his primary care physician, for back and leg pain and control of his diabetes. During the next year, plaintiff saw Dr. Cawog approximately 20 times, and the doctor prescribed various medications in an

8

attempt to alleviate plaintiff's pain, including Neurontin and Vicodin.[7]  (R. 186-87, 206-10, 218-19).

## 6. Electrodiagnostic Report - 8/11/03

On August 11, 2003, plaintiff underwent electrodiagnostic testing based on a referral by Dr. Cawog.  The Impression was described as follows:

**Impression**

NCV FINDINGS: ABNORMAL ELECTRODIAGNOSTIC STUDY THAT SUGGESTS AN EARLY SENSORY NEUROPATHY WHICH MAY BE SECONDARY TO THE PATIENT'S STATED HISTORY OF DIABETES.

NEEDLE EMG FINDINGS: ABNORMAL STUDY.  THERE IS SOME EVIDENCE TO SUGGEST A CHRONIC LEFT SIDED L5-S1 NERVE ROOT IRRITATION POSSIBLY SECONDARY TO DISC DISEASE OR STENOSIS.

(R. 136-37).

## 7. Plaintiff's Statement of Activities - 8/16/03

On August 16, 2003, plaintiff completed a statement regarding his medical impairments and their effect on his daily activities.  In summary, plaintiff indicated that no changes had been made to his home because of his impairments; that doing more than usual on a particular day resulted in pain in his lower back, legs and feet; that his impairments did not affect his ability to care for himself; that he drove to doctors' appointments and to the pharmacy (approximately 20 miles weekly);

---

[7]A printout prepared by Bayers Pharmacy shows that Dr. Cawog prescribed Vicodin (Hydrocodone) for plaintiff on 19 occasions between August 11, 2003 and June 7, 2004.  (R. 211-17).

that, although he could not mow the lawn, do yard work, take out
the trash or use a vacuum cleaner, he could cook a meal and do
laundry and tried to help with some housework and house repairs;
that he could carry two grocery bags if the bags were light; that
he could climb 12 steps or walk 100 yards before he had to stop
due to shortness of breath and leg pain; that he could sit for 30
minutes before he had to change positions due to low back pain;
that he was limited to lifting and carrying 20 pounds at a time
due to low back pain; that he had suffered from fatigue on a
daily basis for 2 years; that he took insulin shots (4 to 6 shots
a day), folic acid, magnesium, Zyrtec, Metoprolol, Oxycodone and
Vitamin B-1; that his low back pain was constant and worse after
he had been up for a few hours; that his low back pain disturbed
his sleep; that he had been taking Oxycodone for his pain since
July; that the Oxycodone provided relief "right away" and lasted
for 7 hours; that he experienced no side effects from the
Oxycodone; that he did not wear or use any devices, such as a
brace or a TENS unit, to relieve the pain; that he did not
require an assistive device to walk; and that he had never
attended physical therapy or been referred to a mental health
professional to help cope with pain.  (R. 100-07).

10

**8. Physical Residual Functional Capacity Assessment - 10/22/03**

On October 22, 2003, a state agency physician completed a Physical Residual Functional Capacity Assessment for plaintiff based on a review of his file. With respect to exertional limitations, the physician opined that plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds; that plaintiff could stand and/or walk about 6 hours in an 8-hour workday; that plaintiff could sit about 6 hours in an 8-hour workday; and that plaintiff's ability to push and pull with his upper and lower extremities was unlimited. The physician also opined that plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (R. 189-98).

**9. Letters of Juan A. Lora, M.D. - 11/21/03 and 1/14/04**

On November 21, 2003, plaintiff saw Dr. Lora for a followup visit. In a letter to Dr. Mills concerning the visit, Dr. Lora noted that plaintiff stated he had "been feeling fine," but that he continued to suffer from low back pain for which he was taking Neurontin and, on occasion, Vicodin. Dr. Lora indicated that he would continue to follow plaintiff's liver function tests, and that if they remained abnormal for the next two months, he would proceed with a liver biopsy and start treatment with Interferon and Ribavirin. (R. 200).

11

Plaintiff's next followup visit with Dr. Lora took place on January 14, 2004.  In a letter to Dr. Mills regarding this visit, Dr. Lora noted that plaintiff "offer[ed] no complaint" and "has had no fatigue, abdominal pain, nausea, vomiting or change in bowel habits."  Dr. Lora also noted that plaintiff's most recent liver function tests were completely normal and his Hepatitis C RNA was negative, although plaintiff still had the antibody to Hepatitis C.  Dr. Lora opined that plaintiff "most likely had an acute episode of Hepatitis C and he has cleared the virus on his own."  Dr. Lora recommended followup tests in six months to confirm the resolution of plaintiff's Hepatitis C.[8]  (R. 199).

### 10.  Employability Re-Assessment Form - 6/12/04

On June 12, 2004, Dr. Cawog, plaintiff's primary care physician, completed an Employability Re-Assessment Form on plaintiff's behalf for the Pennsylvania Department of Public

---

[8]As noted previously, plaintiff applied for SSI due to kidney and liver problems and Hepatitis C.  He did not list low back pain, diabetic neuropathy or migraine headaches as disabling impairments.  In light of the resolution of plaintiff's Hepatitis C by January, 2004, during the hearing before the ALJ, the focus of plaintiff's claim for SSI shifted to these conditions.  In this regard, the Court notes that the ALJ's determination that plaintiff's occasional migraine headaches would have only a minimal impact on his ability to engage in work-related activities is clearly supported by substantial evidence.  The Court further notes that plaintiff has not challenged this determination in the brief filed in support of his motion for summary judgment.  Accordingly, the impairments that are at issue in this case are plaintiff's low back pain and diabetic neuropathy.

12

Welfare, indicating that plaintiff was temporarily disabled until December 12, 2004 due to insulin dependent diabetes mellitus and chronic back pain.

(R. 220-21).

**11. Report of Consultative Examination by Muna Jabbour, M.D. - 9/22/04**

On September 22, 2004, following the hearing before the ALJ, plaintiff underwent a consultative examination by Dr. Muna Jabbour.[9] In his report of the examination, Dr. Jabbour noted plaintiff's complaints of multiple medical problems, including a history of high blood pressure, diabetes mellitus (now insulin-dependent), a history of hepatitis C, constant back pain which he controls by taking Vicodin once or twice a day,[10] a history of

---

[9]During the hearing, the ALJ stated that he was going to request a consultative examination of plaintiff by an internist prior to rendering his decision due to the absence of a medical opinion by an examining source regarding the physical limitations cause by plaintiff's multiple impairments (R. 43-44), and Dr. Jabbour performed the consultative examination.

[10]With respect to plaintiff's history of back pain, Dr. Jabbour indicated that plaintiff reported that his back pain "is constant mostly on exertion, walking and standing for long periods of time which hurts to do his job that he does. It usually requires a lot of lifting since he has been doing construction and a truck driver." (R. 223). If this is an accurate recitation of plaintiff's statement to Dr. Jabbour during the consultative examination on September 22, 2004, the Court notes that it contradicts plaintiff's testimony during the hearing that he had been unable to work as a truck driver since 2000 due to his impairments, being limited to odd jobs in the years preceding the hearing. ("Just some yard work and stuff that I could do." (R. 28)). In this connection, the Court also

13

Bell's palsy with residual headaches "once in a while," chest
pain on exertion,[11] hyperlipidemia and diabetic neuropathy in his
feet.[12]   With respect to plaintiff's physical examination, Dr.
Jabbour noted, among other things, that the strength in
plaintiff's lower extremities was 5/5; that plaintiff's range of
motion was decreased slightly (about 50% in bending); that
plaintiff was unable to get up from a squatting position unless
he held onto a chair, but was able to walk on his toes and heels;
and that plaintiff was able to get on and off the examining table
with no problems.   As to his neurological examination of
plaintiff, Dr. Jabbour noted that plaintiff's muscle strength was
equal and symmetric; that the sensation in plaintiff's feet was
decreased to touch and vibration; and that plaintiff's reflexes
were normal and symmetric.   (R. 222-25).

_____

notes that the records of the WPHC indicate that plaintiff
continued to undergo physical examinations for the DOT at that
facility in 2001 and 2002, despite the fact that his ability to
drive a truck reportedly ended in 2000 due to his impairments.

[11]With regard to plaintiff's report of chest pain to Dr.
Jabbour, the ALJ noted in his decision that the record contains
"little, if any, objective evidence of treatment for ... chest
pain," and he found that this condition would have only a minimal
impact on plaintiff's ability to engage in work-related
activities.   Therefore, it was not a severe impairment.   (R. 13).
Plaintiff does not challenge this finding in the brief filed in
support of his motion for summary judgment.

[12]With respect to plaintiff's diabetic neuropathy, Dr.
Jabbour indicated in his report that plaintiff stated his "[f]eet
get numb and tender.   Sometimes, they hurt on standing at the end
of the day.   He is supposed to be on Neurontin, but he is not
very compliant with Neurontin for neuropathy."   (R. 223).

14

Dr. Jabbour completed a MEDICAL ASSESSMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (PHYSICAL) form for plaintiff, opining that as a result of his impairments, plaintiff was limited (a) to lifting a maximum of 25 pounds occasionally and 10 pounds frequently; (b) to standing and/or walking up to 1 hour without interruption in an 8-hour workday due to back pain radiating into the legs bilaterally; (c) to sitting up to 2 hours without interruption in an 8-hour workday due to back stiffness and sharp pain; (d) to only occasionally climbing, kneeling, crouching, stooping, balancing and crawling; and (e) in his ability to push due to back pain.  (R. 227-30).

## III. Legal Analysis

### A. Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C. § 1383(c)(3) (incorporating Section 405(g)), which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).

15

It consists of something more than a mere scintilla, but something less than a preponderance. <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. <u>Monsour Medical Center v. Heckler</u>, 806 F.2d 1185, 1190-91 (3d Cir.1986).

## B. The 5-Step Sequential Evaluation Process

In <u>Burnett v. Commissioner of Social Security Admin.</u>, 220 F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure an ALJ must follow in evaluating a claim for Social Security disability benefits, stating in relevant part:

\*   \*   \*

In <u>Plummer</u>, we recounted the five step sequential evaluation for determining whether a claimant is under a disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If a claimant is found to be engaged in substantial gainful activity, the disability claim will be denied. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290-91, 96 L.Ed.2d 119 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant

16

> does not suffer from a listed impairment or its
> equivalent, the analysis proceeds to steps four and
> five. Step four requires the ALJ to consider whether
> the claimant retains the residual functional capacity
> to perform her past relevant work. 20 C.F.R.
> § 404.1520(d). The claimant bears the burden of
> demonstrating an inability to return to her past
> relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d
> Cir.1994).

> If the claimant is unable to resume her former
> occupation, the evaluation moves to the final step. At
> this stage, the burden of production shifts to the
> Commissioner, who must demonstrate the claimant is
> capable of performing other available work in order to
> deny a claim of disability. 20 C.F.R. § 404.1520(f).
> The ALJ must show there are other jobs existing in
> significant numbers in the national economy which the
> claimant can perform, consistent with her medical
> impairments, age, education, past work experience, and
> residual functional capacity. The ALJ must analyze the
> cumulative effects of all the claimant's impairments in
> determining whether she is capable of performing work
> and is not disabled.

Plummer, 186 F.3d at 428.

\*   \*   \*

220 F.3d at 118-19.

With respect to the ALJ's evaluation of plaintiff's claim

for SSI in the present case, steps one through four of the

sequential evaluation process were resolved in plaintiff's favor:

that is, based on the record, the ALJ found that (a) plaintiff

had not engaged in substantial gainful activity since his alleged

onset date of disability; (b) plaintiff suffers from severe

impairments, including insulin dependent diabetes mellitus with

neuropathy, hypertension, Hepatitis C (including an acute attack

17

with kidney failure), degenerative joint disease and a history of
Bell's palsy; (c) plaintiff's impairments, either singly or in
combination, did not meet or equal any of the listings in Part
404, Subpart P, Appendix 1 of the Social Security Regulations;
and (d) plaintiff could no longer perform his past relevant work
because plaintiff's job as a truck driver required some postural
activities which plaintiff cannot perform and his job as a paving
helper was of the medium exertional level and plaintiff is
limited to a reduced range of light work.[13]   (R. 13, 16).   Thus,
the analysis proceeded to step five of the sequential evaluation
process, and, based on the testimony of the VE, the ALJ found
that plaintiff was capable of making a successful adjustment to
work which exists in significant numbers in the national economy.
Accordingly, the ALJ found that plaintiff was not disabled.   (R.
17).

### C. **Plaintiff's Arguments in Support of Summary Judgment**

Plaintiff raises three arguments in support of his motion
for summary judgment.   First, plaintiff asserts that the ALJ

---

[13]Curiously, despite plaintiff's clear testimony at the
hearing before the ALJ that his job for the asphalt company was
limited to driving a truck and he never assisted in laying the
asphalt, the ALJ's hypothetical question to the VE included past
relevant work as an asphalt paving helper (R. 27), and both
plaintiff and the Commissioner include this job in plaintiff's
past relevant work in the briefs filed in support of their
respective motions for summary judgment.   (Pl's Brief in Support,
p. 4, Df's Brief in Support, p. 3).

18

improperly substituted his opinion for that of plaintiff's primary care physician, Dr. Cawog, and the consultative examiner, Dr. Jabbour, in finding that plaintiff is capable of working a full 8-hour day. Second, plaintiff asserts that the ALJ mischaracterized his responses in a questionnaire concerning his activities of daily living to support the decision to deny SSI. Third, plaintiff asserts that when asked by his counsel at the hearing to assume the limitations set forth in the reports of Dr. Cawog and Dr. Jabbour, the VE unambiguously testified that a person so impaired would be unable to work on a regular and continuous basis.[14]

i

Turning first to plaintiff's claim that the ALJ misrepresented his responses in Exhibit 4E, a questionnaire concerning the effect of his impairments on activities of daily living, to support an adverse decision (R. 100-07), the Court finds such argument to be meritless. A review of the ALJ's discussion of Exhibit 4E shows that the ALJ accurately described plaintiff's responses which did not support plaintiff's subjective allegations of disabling pain, including plaintiff's statement that the pain medicine relieves his pain "almost right away" and "lasts 7 hrs" with no side effects, and the statement

---

[14]Plaintiff's current counsel did not represent him at the time of the hearing before the ALJ.

19

that he has never used a brace or TENS unit to relieve the pain,
an assistive device to walk or attended physical therapy.
Contrary to plaintiff's assertion, the ALJ's description of his
responses to the questions in Exhibit 4E was not "pure
fabrication." (Pl's Brief in Support, p. 21).

ii

As to plaintiff's argument that the ALJ failed to
incorporate into his hypothetical question to the VE any of the
limitations set forth in the reports of Dr. Cawog and Dr.
Jabbour, and that when such limitations were included in a
hypothetical question posed by his counsel, the VE testified that
the individual would not be able to work on a sustained basis,
the Court also finds this argument to be meritless.[15] The only
hypothetical question posed to the VE by plaintiff's counsel
concerned an individual who was "less than 80 percent"
productive. Plaintiff has failed to cite the evidence on which

---

[15]The ALJ asked the VE whether a hypothetical individual of
plaintiff's age, education and work experience, whose maximum
sustained work capability is limited to light work and who can
only occasionally climb, balance, stoop, kneel, crouch or crawl,
could engage in any unskilled, entry level occupations at the
light or sedentary level. The VE responded affirmatively, citing
the jobs of assembler of plastic hospital products, laundry
classifier, assembler of building products, bench assembler, wire
worker, plastic checker, packager of plastic products and
packager of small products. The ALJ then asked the VE whether
this hypothetical individual could perform the cited jobs if, in
addition, he or she needed to alternate between sitting and
standing up to four times per hour throughout the workday, and
the VE responded affirmatively. (R. 47-48).

20

he relies to support such a limitation, and, as noted by the ALJ, the record as a whole does not support such a limitation.  (R. 17).

### iii

Finally, regarding plaintiff's argument that the ALJ improperly substituted his opinion for that of Dr. Cawog, his treating physician, and Dr. Jabbour, the consultative examiner, in finding that he is capable of working a full 8-hour day, the Court initially notes that nowhere in the record is there a report from Dr. Cawog setting forth the specific physical limitations resulting from plaintiff's impairments.  The "report" of Dr. Cawog on which plaintiff relies in support of this argument is merely one page of a two-page form completed by Dr. Cawog for the Pennsylvania Department of Public Welfare indicating, in a conclusory manner, that plaintiff was temporarily disabled from June 12, 2004 to December 12, 2004 due to insulin dependent diabetes mellitus and chronic back pain.

Turning to Dr. Jabbour's report, plaintiff asserts that the ALJ "ignored without comment the limitations established by the CE that Mr. Baughman was unable to sit **more than 2 hours or stand and/or walk more than 1 hour total in an eight-hour work day**." (Pl's Brief in Support, p. 17, emphasis in original).  After careful review of the MEDICAL ASSESSMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (PHYSICAL) form in which Dr. Jabbour rendered

21

the opinions at issue, the Court is not satisfied that plaintiff has interpreted Dr. Jabbour's assessment of these physical limitations correctly.

The MEDICAL ASSESSMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (PHYSICAL) form asks the completing physician to indicate *both* how many hours a claimant can stand/walk or sit in an 8-hour workday and how many hours a claimant can stand/walk or sit *without interruption* in an 8-hour workday. Rather than answer these questions separately, Dr. Jabbour appears to have combined them, indicating that plaintiff can stand/walk up to 1 hour without interruption in an 8-hour workday and sit up to 2 hours without interruption in an 8-hour workday. Under the circumstances, this matter will be remanded to the Commissioner to seek clarification of Dr. Jabbour's responses to Sections II and III of the MEDICAL ASSESSMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (PHYSICAL) form and to elicit further testimony from a VE following the clarification. In addition, prior to eliciting further testimony from a VE, either party may solicit from plaintiff's primary care physician, Dr. Cawog, his opinion concerning the physical limitations resulting from plaintiff's diabetes mellitus and chronic back pain.

William L. Standish
United States District Judge

Date: November  7 , 2006

22